TERRY'S FLOOR FASHIONS,
INC., Appellant,

v.

BURLINGTON INDUSTRIES, INC.; Lees
Carpets, a Division of Burlington Industries, Inc.; and Eatman's Carpets,
Inc., Appellees.

No. 83-1687.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1984.

Decided May 23, 1985.

William Woodward Webb, Raleigh, N.C. (Broughton, Wilkins & Webb, P.A., Raleigh, N.C., on brief), and Kevin P. Roddy, Charlottesville, Va., for appellant.

Daniel G. Clodfelter, Charlotte, N.C. (Joseph W. Eason, Raleigh, N.C., Hayden J. Silver, III, Moore, Van Allen & Allen, Charlotte, N.C., on brief), and Catherine B. Arrowood, Raleigh, N.C. (Robert W. Spearman, Steven Levitas, Sanford, Adams, McCullough & Beard, Raleigh, N.C., on brief), for appellees.

Before WINTER, HALL and SNEEDEN, Circuit Judges.

SNEEDEN, Circuit Judge.

Plaintiff Terry's Floor Fashions, Inc. ("Terry's"), appeals from a judgment of the United States District Court for the Eastern District of North Carolina, James C. Fox, Judge, 568 F.Supp. 205 allowing the defendants' motions for summary judgment regarding the plaintiff's Sherman Act § 1 claims, 15 U.S.C. § 1; allowing defendant Lees' motion to dismiss a Robinson-Patman Act claim, 15 U.S.C. § 13(a); and allowing the defendants' motions to dismiss pendent state law claims under the North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. §§ 75–1, –1.1, –2, –5, –7. The principal issue on appeal is whether the district court erred in allowing the defendants' motions for summary judgment on the Sherman Act § 1 claims because of the plaintiff's failure to demonstrate the existence of a combination or conspiracy between the defendants. We agree with the district court that there was insufficient evidence to support an inference that the alleged conspiracy existed, and we therefore affirm the district court's judgment. We also affirm the judgment of the district court with regard to the Robinson-Patman Act claim and the pendent state law claims.

I.

The plaintiff is a North Carolina corporation engaged in the business of selling and installing carpet and other floor coverings for residential and commercial purposes. The plaintiff's business is primarily located in Cary, North Carolina. The defendants are Eatman's Carpets, Inc. ("Eatman's"), a North Carolina corporation also engaged in the sale and installation of residential and commercial carpeting, and Lees Carpets ("Lees"), a division of Burlington Industries, Inc., a manufacturer of residential and commercial grade carpet. Terry's and Eatman's were competitors in sales of Lees carpets and remain competitors in selling carpets made by other manufacturers. Eatman's is located in Raleigh, North Carolina.

Eatman's began doing business with Lees in 1970, as a dealer of both residential and commercial grade carpet. Terry's began selling Lees' products in 1975. From 1975 to 1977, Terry's primarily sold Lees' residential line of carpeting. In 1977, how-

ever, Terry's began to purchase and sell, in addition to residential carpeting, small amounts of Lees' commercial grade carpeting. At no time, however, did Lees regard Terry's as one of its principal commercial dealers, a status enjoyed by Eatman's and one which entitled Eatman's to a discount on Lees products. In mid-1980, Terry's, desirous of obtaining similar discounts to those given Eatman's, asked to become a principal commercial dealer for Lees. Lees informed Terry's that it did not wish to program Terry's as a principal commercial dealer and that it preferred to continue concentrating its commercial carpet sales through Eatman's. From that point on, relations deteriorated; and in February 1981, Lees terminated its business relationship with Terry's.

Terry's filed suit on July 9, 1981, alleging violations of various state and federal antitrust laws. In its second amended complaint, Terry's alleged the following: (1) that Lees and Eatman's combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) that Eatman's had attempted to monopolize the relevant market, defined in the complaint, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Lees had conspired with Eatman's in the alleged attempted monopolization; (3) that Lees had engaged in unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a), and that Eatman's had knowingly induced and received such price discrimination in violation of 15 U.S.C. § 13(f); and (4) that the defendants' actions also constituted violations of the North Carolina Unfair Trade Practices Act, §§ 75–1, –1.1, –2, –5, –7. Lees filed a counterclaim for $7,857.60, the price of carpet which Terry's had purchased from Lees, but for which Terry's had not paid.

As indicated above, the district court granted the defendants' motions for summary judgment on the Sherman Act § 1 claims because of the plaintiff's failure to produce sufficient evidence of a conspiracy. The district court also granted the defendants' motions for summary judgment regarding the plaintiff's Sherman Act § 2 claims.[1] The court granted Lees' motion to dismiss, pursuant to F.R.Civ.P. 12(b)(6), Terry's claim of price discrimination in violation of Section 2(a) of the Robinson-Patman Act.[2] The Court further granted defendants' motions to dismiss various pendent state law claims. Finally, the district court granted Lees' motion for summary judgment regarding its counterclaim.

### A. The Carpet Industry and Lees' Marketing Strategy

As the district court accurately observed, "the record reveals a vigorous and highly competitive industry at all levels." *Terry's Floor Fashions v. Burlington Industries*, 568 F.Supp. 205, 208 (E.D.N.C.1983). There are a large number of companies which manufacture residential and commercial grade carpet. The record indicates, for example, that Terry's purchased carpet not only from Lees, but also from Trend Carpets, Armstrong, Stratton, J & J Carpets, J.P. Stevens, Evans & Black, and others.

There are numerous carpet dealers in the market as well. Terry's and Eatman's, for example, were among forty-two authorized distributors of Lees carpet in eastern North Carolina. Eatman's was also one of several large commercial dealers for Lees in the eastern North Carolina area. Others with a sales volume comparable to that of Eatman's included Educational Equipment Company located in Raleigh, Monnett's Carpets & Draperies in Greensboro, and

---

1. Terry's does not appeal the decision of the district court granting summary judgment on its Section 2 monopolization claims. The district court held that Terry's had failed to demonstrate a "dangerous probability" that Eatman's would succeed in its attempted monopolization. *White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir.1974). On the conspir-

acy to monopolize claim, the district court found insufficient evidence from which to infer the existence of a conspiracy.

2. Terry's abandoned its claim under 15 U.S.C. § 13(f) at oral argument before the district court.

Style Perfect Furniture Galleries in Winston-Salem. Joint Appendix at 216.

Lees distributes its carpeting through a system of sales territories throughout the United States. Lees assigns a sales representative to each territory. These territories are not exclusive for distributors, and each Lees sales representative is responsible for developing a network of dealers in his territory. North Carolina is divided into two territories, with both Eatman's and Terry's in the territory covering eastern North Carolina. The Lees sales representative for this territory during the period of time relevant to this suit was John Cummings.

In the carpet industry, there are two broad categories of carpet—residential grade and commercial grade carpet. Residential grade carpet, generally heavier and less densely woven or tufted, is sold primarily for use in homes or for smaller commercial applications. Commercial carpet, lighter weight and more densely woven, is obviously designed to withstand much heavier use. One of the major differences between the two types of carpeting, however, is the manner in which they are marketed. Residential grade carpet is usually sold through retail stores or to building contractors. A dealer in the residential carpet market must, therefore, devote significant resources to media advertising and to a showroom.

Commercial grade carpet, on the other hand, is generally sold through a competitive bidding process. Dealers in the commercial carpet market must engage in intensive sales work with architects, contractors, and purchasing agents in order to persuade them to specify or accept Lees carpet for a particular bid. While the Lees sales representative for that territory does some of this work, Lees relies to a great extent on its commercial dealers. Personal contacts, quality of installation, and reliability of service are much more important in the commercial market than in the residential market. Because the manufacturer's reputation is more visibly at stake in the larger commercial jobs, the manufacturer is very interested in the accountability of his commercial dealers and in the dealer's own reputation for reliability and service.

The selection of dealers for a particular territory is made by the Lees sales representative in consultation with his superiors.[3] Lees does not, however, regard all its dealers to be equally as capable as other dealers. This is particularly true with regard to commercial carpet dealers because of the importance of personal contacts and professional reputation. Lees, therefore, selects some dealers through whom it concentrates its marketing of a particular line of Lees carpeting. That selection is based on an assessment of which dealers are most willing to and capable of effectively promoting Lees products. Incentives are given to these selected dealers, usually in the form of price, to encourage them to market Lees carpeting aggressively.

The giving of such incentives is necessitated by the nature of the carpet industry. Carpet dealers, including both Terry's and Eatman's, are normally authorized dealers for a number of manufacturers. The products of these numerous manufacturers are often interchangeable, and the purchaser of the carpet does not usually specify that only one brand may be used. Some incentive is necessary, therefore, to encourage a particular dealer to promote and bid one manufacturer's product over that of another manufacturer. Thus, Lees' marketing strategy is to choose those of its dealers that it believes will be most effective in marketing its products and to give those dealers a price discount to encourage them to promote and bid Lees carpet. This marketing strategy is apparently a common one in the commercial carpet industry.

As a part of this general marketing strategy, Lees has a policy against sales by its dealers to other Lees dealers or to non-Lees dealers. The practice of dealer-to-dealer sales is sometimes referred to as "bootlegging." The basic purpose of the

---

3. Lees does not sign formal agreements with its dealers.

anti-bootlegging policy is to ensure the integrity of Lees territorial marketing system and its choice of principal commercial dealers within a given territory. Bootlegging undercuts Lees' choice of principal commercial dealers in a territory because a bootlegger may be able to win bids over Lees dealers who have worked with the architect or contractor to ensure that Lees carpet is specified or approved for a particular job. This lessens the incentive which Lees is trying to create for selected commercial dealers to promote and bid Lees carpet. Also, bootlegging may make it more difficult to determine responsibility for certain quality problems. Finally, bootlegging also undermines Lees' system of sales territories serviced by commissioned sales representatives because these representatives lose their commissions on bootlegged sales.[4]

### B. Relations Among the Parties

In 1977, Terry's apparently made the decision to aggressively enter the commercial carpet market. Terry's began to purchase small amounts of commercial carpet from Lees for smaller, negotiated jobs which did not involve competitive bidding. Terry's also entered the competitive bidding market, with its principal supplier being Trend Carpet Mills. Terry's and Eatman's began to compete for major commercial jobs, several involving state institutions. At this time, Eatman's was already a much larger commercial account for Lees and was programmed by Lees as a principal commercial dealer. Eatman's was also a large distributor for Bigelow-Sanford, and both Lees and Bigelow-Sanford competed for Eatman's business.

Ralph Betts, president of Terry's, began to approach John Cummings, Lees' sales representative for eastern North Carolina, about being programmed as a principal Lees commercial dealer. Cummings consulted with his superiors, and a decision was made not to program Terry's as a

major commercial dealer. The status of Terry's was discussed by Betts and Cummings at the semi-annual industry market held in Atlanta, Georgia, in July 1980. Cummings informed Betts that Lees did not wish to carry Terry's as a major commercial dealer. The effect of this decision was that Terry's basically had to purchase at list price. Cummings, in his affidavit, stated that he informed Betts that this decision was based on Lees' judgment that it would be best to continue marketing through its well-established commercial dealers and also on Lees' determination that it could not compete with Terry's principal commercial supplier, Trend Carpet Mills, which was generally regarded in the industry as having very low prices.[5] Joint Appendix at 217.

Betts' recollection of this discussion with Cummings is significantly different. According to Betts' affidavit and deposition, he was informed by Cummings that Lees would not program Terry's as a major commercial dealer because "Bill Eatman had guaranteed Lees a million dollars in sales and so it was agreed that Terry's would not get any lower prices." Joint Appendix at 393. Cummings denies telling Betts that there was any "million dollar guarantee" from Eatman's. He recalls that he told Betts that the Eatman's account had the "potential" to do a million dollars worth of business and that Eatman's had been doing that volume of business with Bigelow-Sanford. Joint Appendix at 201.

In late fall of 1980, both Terry's and Eatman's bid on a job for the Armstrong Media Center at a junior high school in Fayetteville, North Carolina. Terry's bid Lees carpet and won the job with a bid which was the same as Lees' list price for the carpet, the only price available to Terry's. Eatman's had been instrumental in persuading the architect to designate Lees carpet as an acceptable carpeting for the

---

**4.** Lees will sometimes approve a sale from one dealer to another where a dealer cannot get a particular style or color from the mill and another dealer has it in stock. Joint Appendix at 198 and at 220–21.

**5.** Trend Carpet Mills apparently declared bankruptcy in 1981. Trend is no longer a supplier of Terry's. Joint Appendix at 100.

project; but Eatman's ultimately bid carpet made by Bigelow-Sanford, a major competitor of Lees. Cummings stated in his affidavit that he learned Terry's had won the Fayetteville job during a visit to Eatman's when he was shown a copy of the contractor's letter to bidders informing them that Terry's had won the bid with Lees carpet. Joint Appendix at 218. Cummings stated that he was surprised because Terry's had not placed the carpet order through him. Upon further investigation, Cummings discovered that Terry's had purchased the carpet at a significant discount from another Lees distributor, Fashion Carpets of Houston, Texas. Lees decided to allow the sale to go through because the order had already been processed at the mill. When Cummings informed Mr. Eatman of this decision, Eatman became angry, allegedly because Cummings had previously forbidden Eatman's to sell Lees carpet to a carpet dealer in Florida. Cummings described Mr. Eatman's reaction in a letter dated January 9, 1981, to his superior, Jack Col-

lier. Cummings expressed his concern that the decision to let the sale go through would have an adverse effect on his credibility with Eatman's.[6] Cummings never received a commission on this sale.

At the industry market in January 1981, Cummings discussed with Betts the purchase from Fashion Carpets and informed Betts that such a practice was against Lees' policy. Betts responded that he planned to continue making such purchases until Terry's received competitive prices from Lees and that he was in fact trying to purchase some carpet from a dealer in Virginia.[7] On February 9, 1981, Cummings and Collier met with Betts. Collier informed Betts that Terry's would be terminated as a Lees' dealer because of its stated intention of continuing to violate Lees' anti-bootlegging policy.[8]

Since its termination by Lees, Terry's has continued to sell in both the residential and commercial carpet markets. Its busi-

---

**6.** The Cummings letter reads as follows:

Dear Jack:

In the first week of December, Eatman's Carpet lost a commercial job on 800 square yards of Design VI, color 2, to Terry's Floor Fashions. Eatman's was 100% responsible for getting this job specified. Terry's Floor Fashions is a Lees dealer whom we have elected not to price out commercial jobs with. This decision was made at the 1979 January market. Terry's won this job with a bid price of $13.35 sq. yd. installed which was the same as our list price, which is the only price he can use. When this happened, Mr. Eatman became very angry and told me to trace down this order because the only way Terry's could furnish this carpet would be to buy it from another large Lees commercial dealer.

I found out the source who was selling the carpet to Terry's and notified Tom Decker of the situation and he consulted you. A meeting was set up with Fashion Carpets and Mr. Linc Fuge in Houston, Texas concerning this matter and a decision was made that we would have to process the orders and allow the sale. This was done with the understanding that Fashion Carpets would never let this happen again, per my conversation with Mr. Decker the week after Mr. Fuge's meeting. Mr. Eatman was informed of the decision that was made and he became very angry with the outcome. Mr. Eatman made it very clear to me that this decision could have a very drastic effect on our future business with this firm.

He also informed me that he plans on discussing this at length with Mr. Eisler at the up and coming January market.

I appreciate the fact that I will receive commission from this order, however, I hope you realize that this decision to let the sale go through may have an adverse effect on my credibility with Eatman's sales people.

**7.** According to Betts' own affidavit, Betts told Cummings that he would continue to violate Lees' anti-bootlegging policy. Regarding their meeting at the January 1981 market, Betts stated the following, "I told Mr. Cummings that Terry's was, in fact, attempting to purchase some more Lees carpet, this time from a dealer in Virginia, which is what we were going to have to do until we got competitive pricing." Joint Appendix at 394.

**8.** According to Cummings affidavit, they discussed Betts' dissatisfaction with not being programmed as a major commercial dealer for Lees. They also discussed Lees' policy against bootlegging. Collier told Betts that Lees wanted to continue Terry's as a residential carpet dealer, but not as a commercial dealer. Joint Appendix at 222. Betts allegedly responded that Terry's wanted to be both a residential and commercial dealer and that, if necessary, he would continue to purchase from other Lees' dealers. Betts does not recall being told that he could continue as a residential carpet dealer. Joint Appendix at 305.

ness has apparently prospered despite the fact that it is no longer a Lees' dealer.[9]

## II.

■ Summary judgment, under F.R. Civ.P. 56, is appropriate where the court, viewing the record as a whole in the light most favorable to the non-movant, determines that there exists no genuine issue of material fact. Summary judgment is generally not favored in antitrust cases. The Supreme Court has cautioned that summary procedures should be used sparingly in complex antitrust litigation. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962). Summary judgment clearly remains, however, an appropriate procedure in antitrust litigation. Rule 56 should not be "read out of antitrust cases." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 592 (1968). Whether summary judgment is appropriate is de-

pendent upon the particular facts of each case. *Id.* at 259, 88 S.Ct. at 1577–78, 20 L.Ed.2d at 575. Moreover, the burden is on the plaintiff to produce evidence of an alleged conspiracy when the defendant has produced evidence conclusively showing that the facts on which the plaintiff relies to support his allegation are not susceptible of the interpretation which plaintiff attempts to give them. *Id.* at 289, 88 S.Ct. at 1593, 20 L.Ed.2d at 592.

### A. Claims under Section 1

■ Section 1 of the Sherman Act requires, by its own terms, proof of a "contract, combination, ... or conspiracy." 15 U.S.C. § 1.[10] Concerted action is the essence of a Section 1 claim. The Supreme Court has, moreover, recently reiterated the well-settled rule that Section 1 does not proscribe independent action. *Monsanto Co. v. Spray-Rite Corp.*, —— U.S. ——, 104

---

**9.** Betts' deposition reads, in pertinent part, as follows:

> Q. Have you been successful on more or fewer bidding situations since February 1981 than you were before?
> A. In relationship to other manufacturers?
> Q. In relationship to winning the job?
> A. Winning the job with other manufacturer's, yes.
> Q. You have been, what, more or less successful?
> A. I would say more.

Joint Appendix at 366.

**10.** In addition to establishing a conspiracy, a successful plaintiff must also show: (1) that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market; (2) that the objects of and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy. *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195–96 (6th Cir.1982) *cert. denied*, —— U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984). The district court, because it decided that there was insufficient evidence from which to infer a conspiracy, specifically did not reach the issue of whether defendants' conduct, if proved, would be subject to a per se analysis. *Terry's Floor Fashions v. Burlington Industries*, 568 F.Supp. 205, 214 n. 7 (1983). We agree with the district court that it is unnecessary to reach this issue.

Assuming, *arguendo*, the existence of a conspiracy, it would seem clear that the defendants' conduct should be analyzed under a rule of reason approach. The nonprice vertical restrictions involved in this case, such as Lees' selection of specific dealers for a special program and Lees' policy against dealer-to-dealer sales should be analyzed under the rule of reason. *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). One commentator, now a federal judge, has argued that certain vertical restrictions should be viewed as per se *legal.* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6 (1981).

Lees' termination of Terry's as a dealer, assuming the existence of a conspiracy between Lees and Eatman's, should also be analyzed under a rule of reason approach. Termination of a distributor resulting from a conspiracy between *one* competing distributor and *one* manufacturer is not analyzed under the per se rule regarding concerted boycotts set forth in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). *See* L. Sullivan, *Handbook of the Law of Antitrust* § 91, pp. 260–61. Such a situation fits more appropriately under *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420 (D.C.Cir.1957), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

Since the defendants' conduct in this case should be analyzed under a rule of reason, the lack of evidence in the record indicating competitive harm should be noted.

S.Ct. 1464, 79 L.Ed.2d 775 (1984).[11] A manufacturer has a right to deal, or refuse to deal, with a particular distributor as long as it does so unilaterally. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

Adducing proof of a conspiracy is not an easy task, despite the fact that "direct proof of an express agreement is not required." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). A plaintiff may rely on inferences drawn from circumstantial evidence. *Id.* at 111. There is, however, a line to be drawn between reasonable inferences and mere speculation. The district court was correct in its observation that "[p]laintiff's conclusion or speculation as to existence of a conspiracy, without more, is not sufficient to establish a Section 1 violation." *Terry's*

*Floor Fashions v. Burlington Industries,* 568 F.Supp. 205, 210 (E.D.N.C.1983).

## B. The Monsanto Decision

The Supreme Court, in its recent *Monsanto* decision, provided us with guidance regarding what proof is necessary to permit the inference of a conspiracy in distributor termination cases. *Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. —, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In so doing, the Court resolved what had been a significant split among the circuits.[12] The Court held that a conspiracy is not established by proof that a manufacturer terminated a distributor following, or even in response to, complaints by other dealers. *Id.* at —, 104 S.Ct. at 1470, 79 L.Ed.2d at 785. The Court determined that "something more than evidence of complaints is needed. There must be evidence which tends to exclude the possibility that the

11. The Supreme Court again emphasized the importance of distinguishing between concerted and independent action in *Copperweld Corp. v. Independence Tube Corp.*, — U.S. —, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that a parent corporation and its wholly owned subsidiary are legally incapable of conspiring in violation of § 1 of the Sherman Act.) In his majority opinion, Chief Justice Burger wrote the following:

The Sherman Act contains a 'basic distinction between concerted and independent action.' *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. —, —, 104 S.Ct. 1464, —, 79 L.Ed.2d 775 (1984). The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression.

*Id.* at —, 104 S.Ct. at 2740, 81 L.Ed.2d at 641. The Court also reiterated that vertical agreements (presumably other than resale price maintenance agreements) are to be judged under a rule of reason. *Id.* at —, 104 S.Ct. at 2741, 81 L.Ed.2d at 641–42.

12. Those circuits holding that dealer complaints and subsequent termination were insufficient to sustain the inference of a conspiracy included the Third Circuit, Second Circuit, Sixth Circuit and First Circuit. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110–111 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Schwimmer v.*

*Sony Corp. of America*, 677 F.2d 946, 952–53 (2nd Cir.1982), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 79 L.Ed.2d 398 (1982); *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1199 (6th Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 856–57 (1st Cir.1982); *see also Blankenship v. Herzfeld*, 661 F.2d 840, 845 (10th Cir.1981).

One panel of the Eighth Circuit adopted this standard in *Roesch, Inc. v. Star Cooler Corp.*, 671 F.2d 1168, 1172 (8th Cir.1982), while another panel held to the contrary in an opinion filed the same day in *Battle v. Lubrizol Corp.*, 673 F.2d 984, 990–92 (8th Cir.1982). Both cases were heard en banc, and the Court was equally divided between the two positions. Compare *Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235 (8th Cir.1983) (en banc), with *Battle v. Watson*, 712 F.2d 1238, 1240 (8th Cir.1983) (en banc) (McMillian, J., dissenting).

The Fourth Circuit held prior to *Monsanto* that it would, under appropriate circumstances, follow the standard of proof adopted by the Seventh Circuit in *Spray-Rite Service Corp. v. Monsanto Corp.*, 684 F.2d 1226, 1238–39 (7th Cir. 1982), and by the Eighth Circuit in *Battle v. Lubrizol Corp.*, 673 F.2d 984, 990–92 (8th Cir. 1982). *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1213–1215 (4th Cir.1983). The Seventh and Eighth Circuits had held that evidence showing that a manufacturer terminated a price-cutting distributor following complaints by competing distributors was sufficient evidence from which to infer a conspiracy.

manufacturer and nonterminated distributors were acting independently." *Id.* at ——, 104 S.Ct. at 1471, 79 L.Ed.2d at 785. The plaintiff must present "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective'." *Id.* at ——, 104 S.Ct. at 1471, 79 L.Ed.2d at 786 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3rd Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) ).[13]

### C. Evidence Supporting the Section 1 Claim

With the foregoing procedural and substantive principles in mind, we turn to consideration of the evidence presented in this case. Terry's alleges a conspiracy between Lees and Eatman's, the terms of which are as follows:

(a) Lees has agreed to sell and has sold carpets to Eatman's at lower prices than those quoted to Terry's for carpets of similar quality and quantity;

(b) Lees has instructed its distributors in other territories to refrain from selling carpeting to Terry's;

(c) Lees has refused to sell carpeting at any price to Terry's;

(d) Eatman's has agreed to provide Lees with guaranteed dollar volume of sales per year in exchange for this preferential pricing treatment.

Complaint paragraph 14(a)-(d). Joint Appendix at 11. Basically, the complaint appears to allege a conspiracy to: (1) preclude Terry's from becoming a principal commercial dealer for Lees (thereby assuring Eatman's of more favorable prices); and (2) to terminate Terry's as a Lees dealer altogether.[14] According to Terry's, the evidence from which a conspiracy may be inferred consists of four incidents: (1) the alleged "million dollar guarantee"; (2) the differential in the prices quoted to Terry's and to Eatman's; (3) the testimony of William Creech; and (4) the Fashion Carpets incident. Appellant's Reply Brief at 1–2.

The "million dollar guarantee" was allegedly given to Lees by Eatman's in exchange for an understanding that Terry's

---

**13.** In applying this new standard to the facts in *Monsanto,* the Court concluded that there was sufficient evidence for the jury to have reasonably concluded that there was an agreement or conspiracy to maintain resale prices and to terminate price-cutting distributors. The Court emphasized that, even following Spray-Rite's termination, Monsanto approached at least two other price-cutting distributors to pressure them into maintaining the suggested resale price. The Court also discussed the content of a newsletter written by a distributor following a meeting between that distributor and several Monsanto officials. The newsletter, published just four weeks before the termination of Spray-Rite, discussed Monsanto's efforts to get "the market in order" and stated in part the following:

> In other words, we are assured that Monsanto's company-owned outlets will not retail at less than their suggested retail price to the trade as a whole. Furthermore, those of us on the distributor level are not likely to deviate downward on price to anyone as the idea is implied that doing this possibly could discolor the outlook for continuity as one of the approved distributors during the future upcoming seasons.

*Monsanto Co. v. Spray-Rite Corp.,* —— U.S. at ——, 104 S.Ct. at 1471–72, 79 L.Ed.2d at 787

(quoting newsletter found in *Monsanto* Appendix at 66–67). The Court determined that it was reasonable to interpret the newsletter as referring to an agreement to maintain resale prices. Earlier in its opinion, the Court had also noted the fact that there was evidence of numerous complaints from various competing distributors about Spray-Rite's price-cutting and that there was testimony that a Monsanto official had stated that Spray-Rite was terminated because of these complaints. *Id.* at ——, 104 S.Ct. 1468, 79 L.Ed.2d at 782.

**14.** *Monsanto* involved the familiar scenario in distributor termination cases of termination of a *price-cutting* distributor following complaints by his non-discounting competitors. The conspiracy involved in *Monsanto* was one to "maintain resale prices and terminate price-cutters." *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775, 786 (1984). The conspiracy or conspiracies alleged by Terry's do not involve resale price maintenance; and, as the district court pointed out, Terry's was not a discounter or price-cutter. *Terry's Floor Fashions v. Burlington Industries,* 568 F.Supp. 205, 213 (E.D.N.C.1983). We find that the standard of proof set out in *Monsanto* is controlling in this case despite this factual distinction.

would not receive a better price than did Eatman's. As discussed earlier, Ralph Betts stated that he was informed by John Cummings of this "guarantee" at the July 1980 carpet market. Cummings recalls that he told Betts that Eatman's had the "potential" to do over a million dollars in business and had done so for one of Lees' competitors. In his affidavit, Eatman flatly denied giving any such guarantee; and Eatman's has, in fact, never done a million dollars in business for Lees. Joint Appendix at 386. Significantly, Betts admitted in his affidavit that his conversation with Cummings was the only evidence of this alleged guarantee. Joint Appendix at 283. Betts also acknowledged that the existence of the guarantee was a conclusion that he had drawn from his conversation with Cummings.[15]

The price differential alleged by Terry's is based on Betts' deposition and on certain statistical charts. One chart purportedly shows that when Terry's and Eatman's both bid Lees carpet on the same job, Eatman's bid was consistently lower.[16] Appellant's Brief at 29. A second chart purports to show Terry's low success rate in bidding Lee's carpets in comparison to its success rate in bidding carpet made by other manufacturers. Appellant's Brief at 18.

The Creech testimony refers to the deposition of William Creech, a carpet installer who had worked at various times for both Terry's and Eatman's. Creech stated that he had had a conversation with William Eatman regarding Terry's in late 1980 or 1981. Creech recalled the conversation, in pertinent part, as follows:

> I met Mr. Eatman in the middle of the showroom and that's when he asked me did I install for Terry's. And I told him no, not at the present time, that I had in the past, had helped Ralph Betts out to catch up, but I had never installed for Ralph on a regular basis. And he says, well, Terry's is creating a little static over at UNC. And he says, when I come back the samples are going to leave Terry's or either they're going to leave here, and I don't care which.

Joint Appendix at 504.[17] Mr. Eatman, in his affidavit, denied having any such conversation with Creech and denied ever telling Cummings that he wanted Lees products pulled from Terry's. Joint Appendix at 386–387.

The final piece of evidence which Terry's offers in support of a conspiracy is the Fashion Carpets incident in which Terry's purchased carpet from another Lees dealer. That incident, described earlier, resulted in an angry complaint from William Eatman to Cummings, a complaint which Cummings discussed in the letter to his superior. Terry's was later terminated by Lees after Mr. Eatman's complaint.

### D. Analysis

Keeping in mind that we must view all of the evidence in the light most favorable to

---

**15.** Betts' deposition reads, in pertinent part, as follows:

Q. ... How about paragraph 14(d)? [portion of the complaint alleging the "million dollar guarantee"]
A. Basically what John Cummings told me at the July 1980 market.
Q. Okay, in which you ...
A. ... formed my conclusion that that be the case.
Q. Okay. You stated your conclusion that this paragraph 14(d) is correct. Let me ask you, did Mr. Cummings use the language that appears in paragraph 14(d) of the complaint to you, or did he say something from which you formed this conclusion?
A. Okay, everything was used with the exception of—wait a minute, let me read the whole thing—I formed the conclusion from what John Cummings told me.

Joint Appendix at 287.

**16.** This chart, however, does not show the difference in the *price* quoted to Terry's and to Eatman's, but instead shows the difference in the actual *bid* given by each. Thus, the figures listed under the heading "Difference in Price" are actually the differences in the two bids. While the manufacturer's price to the distributor is certainly a major factor in determining what a distributor will ultimately bid, that is not the sole determinant of a bid.

**17.** The "static" on which Mr. Eatman commented apparently refers to the annual carpet contract at the University of North Carolina. Eatman's had had this contract since 1973. In 1979, it was rebid at the insistence of Terry's. Eatman's won the contract again, but Terry's continued to encourage that it be rebid.

Terry's, we find that the plaintiff has not produced sufficient evidence to present a genuine issue of material fact as to the existence of a conspiracy between Lees and Eatman's. Under the standard of proof recently announced in *Monsanto*, the plaintiff has failed to present evidence reasonably tending to prove a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Corp.*, —— U.S. ——, ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775, 786 (1984) (*quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). Moreover, the plaintiff has failed to produce evidence tending to exclude the possibility that Lees and Eatman's were acting independently. *Id.* at ——, 104 S.Ct. at 1471, 79 L.Ed.2d at 785.

The actions taken by Lees, of which Terry's complains, are consistent with Lees' independent marketing strategy and with Lees' unilateral decision not to program Terry's as a major commercial dealer. The price differential complained of by Terry's is entirely consistent with Lee's marketing strategy of giving certain selected dealers a price incentive to promote and bid Lees commercial carpet aggressively. Lees' decision not to include Terry's in its commercial dealer program was an independent business decision made sometime prior to the carpet market in July of 1980. The only evidence to support the existence of a conspiracy between Eatman's and Lees to preclude Terry's selection as a primary commercial dealer is the so-called "million dollar guarantee." The existence of such a

"guarantee", however, is based entirely on the speculative conclusions of Ralph Betts, president of Terry's. As such, it is insufficient to support an inference of a conspiracy.

Lees' action in instructing other Lees distributors not to sell to Terry's is consistent with Lees' anti-bootlegging policy, which again is part of its overall marketing strategy. Lees decision to ultimately terminate Terry's stemmed from Terry's stated intention to continue violating that anti-bootlegging policy until given the same commercial dealer status as Eatman's.[18]

The evidence which Terry's offers to show that its termination was not an independent decision by Lees, but instead the product of an illegal conspiracy, is primarily the fact that Terry's was terminated following one or more complaints by Eatman's. Eatman's complaint was apparently precipitated by the Fashion Carpets incident, in which Terry's had won a bid with carpet which it had "bootlegged" from another Lees dealer. The letter written by Cummings to his superior does indeed show that Mr. Eatman very angrily complained to Cummings about the fact that the order was allowed to go through and threatened that the decision could have a "drastic effect" on Lees' future business with Eatman's.[19]

The deposition of William Creech is also offered to support the allegation of a conspiracy to terminate Terry's. The district court did not consider Creech's testimony because it determined that there was insufficient independent evidence of a conspiracy to admit Creech's hearsay statement under F.R.Evid. 801(d)(2)(E).[20] Even if

---

**18.** Terry's was not terminated at the time of the Fashion Carpets incident. That sale was allowed to go through, and Terry's and Fashion Carpets were warned not to violate the anti-bootlegging policy again. It was after Terry's clearly indicated its intention to continue violating this policy that Lees decided to terminate Terry's.

**19.** *See supra,* note 5.

**20.** Creech's testimony regarding Mr. Eatman's statements may possibly have been admissible under F.R.Evid. 801(d)(2)(C) or (D) despite the

lack of independent evidence of a conspiracy. *But see Oreck v. Whirlpool Corp.*, 639 F.2d 75, 80–81 (2nd Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981) (civil antitrust case where plaintiff was attempting to establish a conspiracy.) The court in *Oreck* stated:

... even if declarant's statements were to be considered as admissions of Whirlpool as a party defendant, F.R.E. 802(d)(2)(D), in view of the complete lack of independent evidence of a conspiracy involving Sears, we hold that

Creech's testimony regarding his conversation had been admissible, however, we find that consideration of this testimony does not significantly improve the plaintiff's position. Assuming that Creech's recollection of his conversation with Eatman was truthful and accurate, a significant amount of speculation is still required to infer a conspiracy to terminate Terry's. First, one must speculate whether Eatman did in fact make such a complaint or threat to Lees. Assuming that Eatman did so, one must engage in further speculation regarding the impact of such a complaint on Lees and whether it led · to the "meeting of the minds" required by *Monsanto*. At best, Creech's deposition can be read to indicate yet another complaint by Eatman's to Lees.

 It is clear under *Monsanto*, however, that evidence of a distributor's termination by a manufacturer following, or even in response to, complaints by other distributors is not sufficient evidence from which to infer a conspiracy. *Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. —, —, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775, 785 (1984). Unlike *Monsanto*, which involved numerous complaints by various distributors over a long period of time, this case involves at most two complaints by a single distributor. This evidence does not tend to exclude the possibility that Eatman's and Terry's were acting independently, particularly in light of the evidence offered by Lees regarding its independent marketing strategy and policies. Terry's has, therefore, not met its burden of proof under *Monsanto*. Summary judgment for Lees and Eatman's was properly granted by the district court.

### III.

 We must now address the appellant's remaining claims under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), and under various provisions of the North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1, –1.1, –2, –5, –7. The district court granted Lees' motion to dismiss, pursuant to F.R.Civ.P. 12(b)(6), the Robinson-Patman Act price discrimination claim. The district court found that Terry's had not shown, or even alleged, two comparable, completed sales and had therefore not satisfied one of the jurisdictional prerequisites for establishing a violation of Section 2(a) of Robinson-Patman. We agree and accordingly affirm the judgment of the district court.

The district court also dismissed several pendent state law claims following the dismissal or the granting of summary judgment regarding all federal claims. The court properly exercised its discretion to decline to reach these pendent claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We affirm.

The judgment of the district court is affirmed.

AFFIRMED.

HARRISON L. WINTER, Chief Judge, concurring specially.

I concur in Part III of the majority opinion. I also concur in the dismissal of plaintiff's § 1 Sherman Act claim, but for reasons different from those relied on by the majority. Hence I write to set forth my separate views.

### I.

As the majority recognizes, *Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. —, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), states the evidentiary requirements for proving concerted action in a distributor termination case. Evidence of complaints by other distributors, followed by termination of the plaintiff's distributorship, will not by itself support a finding of concerted action. A manufacturer would otherwise face the threat of treble damages solely because it acted on the information originating as a distributor complaint. The danger of liability based on such "highly ambiguous evidence" would deter lawful unilateral conduct and the optimal use of mar-

testimony regarding those statements should not have been admissible.

*Id.* at 80–81.

ket information, thereby creating "an irrational dislocation in the market." *Monsanto*, — U.S. at ——, 104 S.Ct. at 1470, 79 L.Ed.2d at 785. Therefore, "something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* — U.S. at ——, 104 S.Ct. at 1471, at 785.[1]

In my view, the evidence in this case met that standard. Here there was evidence of an understanding or agreement between Lees and Eatman's. Eatman's would get better prices than Terry's on Lees carpet, in return for which Eatman's would promote Lees carpet. Terry's tried to circumvent this arrangement by buying Lees carpet from other sources. There is evidence that Eatman's then pressed Lees to effectuate their prior understanding on preferential pricing by terminating Terry's distributorship. This evidence presents a genuine dispute of material fact regarding plaintiff's allegation that Lees and Eatman's conspired to exclude plaintiff from competition with Eatman's in marketing Lees carpet.

To be more specific, the evidence showed that the termination of Terry's occurred in the following circumstances. First, there was evidence that by mid-1979 John Cummings, the sales representative for Lees, uniformly gave more favorable prices to Eatman's than to plaintiff. This enabled Eatman's to submit lower bids than plaintiff on jobs using Lees carpets. At the carpet market in July of 1980, plaintiff requested more favorable treatment. Cummings allegedly responded that Eatman's had guaranteed a million dollars in sales, and that it had been "agreed" that plaintiff would not be given a lower price. Plaintiff was subsequently told that it would no longer be given any discount at all, but would be quoted only the list price.

When plaintiff could not obtain better treatment from Lees, it arranged in late 1980 to buy the same Lees carpet, quoted by Lees at $13.65 per square yard, from a fellow retailer in Houston, Texas for $9.75 per square yard. This favorable purchase enabled plaintiff to win the carpet contract on the Armstrong Media Center project in Fayetteville, North Carolina. Eatman's, too, had sought this contract, and Eatman's president became very angry that plaintiff was able to secure Lees carpet from another supplier and win the contract.

Eatman's protest about competition from plaintiff was documented in a letter Cummings wrote to the head of Lees' commercial carpet department. The letter described Eatman's anger and its demand that the source of plaintiff's supply be traced. Lees complied, tracking down the Texas supplier and cautioning that supplier not to sell to plaintiff at a discount again. Lees decided, however, to honor the sale. Cummings' letter notes that when Eatman's president learned Lees would honor the sale, he "made it very clear to me that this decision could have a very drastic effect on our future business with this firm."

Further evidence that Eatman's worked to force Lees' hand comes from the deposition of William F. Creech, a carpet installer who had worked for both plaintiff and Eatman's. Creech said that in late December, 1980 or early January, 1981, he talked with Eatman's president. Eatman's president allegedly told him that plaintiff was creating "static", and that "we're going to the market [to talk with Lees] ... [W]hen I come back the samples are going to leave [plaintiff's place of business] or either they're going to leave here, and I don't care which."[2]

In summary, plaintiff tendered evidence that Eatman's received better prices than

---

1. This does not mean "that evidence of complaints has no probative value at all, but only that the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy." *Monsanto*, —

U.S. at —— n. 8, 104 S.Ct. at 1471 n. 8, 79 L.Ed.2d at 785 n. 8.

2. The district court erroneously refused to consider this evidence because it was "hearsay." It was admissible on two grounds—as an admission against Eatman's, Fed.R.Evid. 801(d)(2)(D),

plaintiff in exchange for Eatman's guarantee of minimum sales. Coupled with this was evidence that Eatman's threatened to break its "promise" of promoting Lees carpet, unless Lees kept its "promise" of preferential price treatment by preventing plaintiff's "bootleg" competition. Given these facts, a jury could conclude that Lees' refusal to deal with plaintiff stemmed, not from Lees' unilateral and independent decision, but from defendants' "conscious commitment to [the] common scheme" of excluding plaintiff from competition with Eatman's in marketing Lees carpet. *Monsanto*, —— U.S. at ——, 104 S.Ct. at 1471, 79 L.Ed.2d at 786. Thus I think that summary judgment for defendants on the ground that Lees acted independently was improper.

## II.

I nevertheless think that plaintiff has failed as a matter of law to show that the alleged concerted action violated § 1 of the Sherman Act. As *Monsanto* recognizes, "it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages." *Id.*, —— U.S. at ——, 104 S.Ct. at 1470, 79 L.Ed.2d at 785.[3] Concerted action on nonprice restrictions is subject to the rule of reason, and is unlawful only if it adversely affects competition in the relevant market. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In my view, plaintiff has failed to tender evidence showing that the conspiracy alleged had any such anticompetitive effect; hence summary judgment for defendants was appropriate.

There was no showing here that Lees conspired to fix or maintain resale prices with its various commercial carpet distributors.[4] There was no evidence of suggested resale prices at all, or of particular instructions from the manufacturer to plaintiff on the prices it should charge. Eatman's may well have complained about plaintiff's bids to supply Lees carpets, but that is not the same as complaining that plaintiff was undercutting a price level that the manufacturer and other distributors were conspiring to maintain.

Here the jury could conclude that the defendants "conspired" to refuse to deal with plaintiff for its violation of the nonprice restriction on "bootlegging," the practice that enabled plaintiff to compete with Eatman's on Lees carpet bids. The effect of the bootlegging restriction is to preserve the nonprice territorial restrictions giving distributors like Eatman's an area in which to operate as one of the principal promoters of Lees carpet. Limiting the number of distributors, and even eliminating existing ones to make the remaining ones sole outlets for a region, is conduct judged under the rule of reason. *See, e.g., Schwing, Motor Co. v. Hudson Sales Corporation*, 138 F.Supp. 899 (D.Md.), *aff'd*, 239 F.2d 176 (4 Cir.1956), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957); *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418 (D.C.Cir.), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957) (rule of reason applied where car manufacturer terminated plaintiff dealer to make another dealer its sole outlet in Baltimore area).

Plaintiff concedes that unilateral refusals to deal are lawful, but argues that the defendants' concerted refusal to deal with plaintiff is *per se* unlawful. Plaintiff in essence argues that defendants' conduct constituted a group boycott forbidden by *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Some precedent supports this ap-

---

and as a statement of intent to prove subsequent intended conduct, Fed.R.Evid. 803(3).

**3.** In *Monsanto* the Court declined the invitation to reconsider the per se rule applicable to conspiracies to fix resale prices. *Id.*, —— U.S. at —— n. 7, 104 S.Ct. at 1469–70 n. 7, 79 L.Ed.2d at 784 n. 7.

**4.** Resale price maintenance seems unlikely in an industry where the use of competitive bids, constant variation in the size and terms of sales, and varying installation costs would make uniform resale pricing difficult.

proach. *See, e.g., Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3 Cir.1979).

The argument is flawed, however, because it fails to distinguish between horizontal boycott agreements amongst competitors and vertical, intrabrand restraints like those present here. Horizontal restraints serve only to stifle competition. Vertical, intrabrand refusals to deal, on the other hand, may limit *intra* brand competition, but at the same time promote *inter* brand competition, "by allowing a manufacturer to achieve certain efficiencies in the distribution of its products."[5] *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2 Cir.1978) (en banc) (*Klors* argument for *per se* analysis rejected where manufacturers and one distributor allegedly conspired to terminate other distributor), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979). The intrabrand-interbrand tradeoff is the same consideration that led the Supreme Court to use the rule of reason in analyzing vertical nonprice restrictions generally. *See GTE Sylvania*, 433 U.S. at 54, 97 S.Ct. at 2559.

Here the preferred evidence shows that Lees channeled its commercial grade carpet through a limited number of dealers to encourage their promotion of Lees carpet over other brands they handled. "[I]f all dealers were equally able to bid against one another to supply Lees commercial products, then no particular dealer would have sufficient incentive to commit the effort and resources necessary to insure that Lees carpet, as opposed to other brands, would be specified by architects or end users, approved and bid." Brief for Appellees at 33. Plaintiff's conduct illustrates this "free rider" problem. The contract that plaintiff won with "bootlegged" carpet, according to Lees' employee Cummings, was one that Eatman's was "100% responsible" for getting specified. The evidence thus suggests that defendants' alleged joint effort to limit *intra* brand competition may have had a positive effect on *inter* brand competition in the commercial carpet market, and that such a restraint is therefore suitable for rule of reason analysis.

Under rule of reason analysis, plaintiff must show that the challenged restraint has adversely affected competition in the commercial carpet market. In this case, it has not made a prima facie showing in this regard. There is no evidence on the importance of either Lees or plaintiff in the relevant markets. There is no evidence on any lessening of competition in the market generally. The market still has the same number of distributors; plaintiff simply bids other brands of carpet, and has apparently been even more successful in winning bids since the Lees termination. The only carpet plaintiff may not handle is that made by Lees. This alone does not show anticompetitive effect.

I would therefore affirm the summary judgment for defendants on the ground that plaintiff has not shown that the alleged conspiracy had any anticompetitive effect.

---

**5.** Vertical intrabrand resale price maintenance is singled out for *per se* treatment because it may inhibit *inter* brand competition, *GTE Sylva-nia,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18, by facilitating interbrand price collusion and conscious parallelism.