**NATIONAL MARINE ELECTRONIC DISTRIBUTORS, INC., a Georgia Corporation, Appellant,**

v.

**RAYTHEON COMPANY, a Delaware Corporation, Appellee,**

**and**

**LARRY SMITH ELECTRONICS, INC., a New Jersey Corporation, Defendant,**

v.

**WELLINGTON LEISURE PRODUCTS, INC., a Georgia Corporation, Third-Party Defendant.**

**NATIONAL MARINE ELECTRONIC DISTRIBUTORS, INC., a Georgia Corporation, Plaintiff,**

v.

**RAYTHEON COMPANY, a Delaware Corporation, Appellee,**

**and**

**LARRY SMITH ELECTRONICS, INC., a New Jersey Corporation, Defendant,**

v.

**WELLINGTON LEISURE PRODUCTS, INC., a Georgia Corporation, Appellant.**

Nos. 84–2019, 84–2026.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1985.

Decided Nov. 27, 1985.

Rehearing and Rehearing En Banc Denied Jan. 6, 1986.

Charles A. Price (Bangert & Price, Washington, D.C., Clinch Heyward Belser; Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., on brief), for appellant.

Stephen Holtman (Robert W. Dibble, Jr., McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, Columbia, S.C., on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

National Marine Electronic Distributors, Inc., is a mail order catalog retailer of marine electronic products, including the products of Raytheon Company. National filed this action after Raytheon stopped selling to it, alleging that Raytheon's decision was the result of a conspiracy with its dealers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In its brief, National particularized its claim as follows:

> Throughout this case, National's fundamental claim has been that Raytheon combined or conspired with one or more of its dealers to terminate its relationship with National with the purpose and effect of horizontally restraining price competition in the retail sale of Raytheon's products in *per se* violation of Section 1 of the Sherman Act....

The district court directed a verdict in favor of Raytheon on the ground that the evidence was not sufficient to prove the existence of a conspiracy. We affirm because tested by *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), proof of dealer complaints did not establish a conspiracy to restrain price competition.

### I

Raytheon manufactures and sells a wide range of marine products throughout North America and Europe. Light marine products are sold primarily through a network of approximately 200 independent dealers, although some sales are made through other channels. Raytheon's standard dealer agreement required dealers to maintain a service department. National began selling Raytheon's products through its catalogs in 1977. Until 1981, National purchased its requirements through Raytheon dealers, and it did not have a service department. In response to National's attempt to place a large order for all of its requirements with a single Raytheon dealer, Raytheon decided to sell its products directly to National. In return, National agreed not to publish the prices of certain Raytheon products in its catalogs. National also understood that it would not be included in Raytheon's published list of dealers, and it would not be able to participate in Raytheon's cooperative advertising program. Also, National would be required to pay a 2% surcharge on some products until it established a service department. The size of National's order was larger than those of most Raytheon dealers.

Shortly after Raytheon agreed to supply National, several Raytheon dealers became aware of this arrangement. The dealers complained that marketing through mail without a service department gave National a competitive advantage over dealers who were required to maintain these departments. Several of the dealers complained to Raytheon that continued competition from National might compel them to terminate their Raytheon dealerships.

At the same time that Raytheon's dealers were becoming aware of the agreement with National, Raytheon's management was re-examining the marketing structure of its business. A variety of sales arrangements was considered, including company owned stores, the present independent dealership structure, and mail order direct sales. Eventually a decision was made not to pursue mail order sales. Raytheon then informed National that no further orders would be accepted.

National contends that Raytheon succumbed to the pressure of dealer complaints and, in fact, conspired with its dealers to terminate National's direct selling relationship. Raytheon argues that dealer complaints, if any, were not significant. Raytheon maintains that the decision not to accept further orders from National was based on an independent evaluation of

sales strategy and a determination that Raytheon should not participate in the mail order market.

The testimony at trial revealed a significant dispute over the dealer complaints and Raytheon's reaction. Larry Anderson, Raytheon's national sales manager, testified that he was contacted by several dealers concerning the agreement with National. He explained to the dealers that National was not an authorized dealer and that Raytheon had accepted only one order from National. He also testified that the dealers' concerns were not really complaints and that there were no threats from the dealers that they would quit their franchises if the relationship with National was not terminated.

The evidence offered by National was to the contrary. National's president testified that Anderson told him that Raytheon terminated the relationship in response to dealer complaints. Raytheon's credit manager testified on deposition that Anderson told him that the National account was terminated because the other dealers were experiencing a loss of business and had threatened to drop the Raytheon line.

Raytheon's regional sales manager for Florida, an important sales area, testified that he had received and communicated to Anderson complaints from dealers and demands that National be terminated. He also testified that other regional managers had received similar complaints and that Anderson had acknowledged them.

Larry Smith, a major Raytheon dealer, sought to prevent his own loss of business with Raytheon as well as to head off a general industry drift toward mail order sales. He complained to Anderson and also contacted other major Raytheon dealers to alert them to the arrangement with National. A Florida dealer, after being contacted by Smith, called other local dealers and urged them to call Raytheon and voice their opinions. This dealer also testified that he called Anderson to complain and to give notice that if Raytheon continued its relationship with National he would discontinue his Raytheon dealership. Another dealer testified that Anderson admitted to him that Raytheon had terminated National because of the adverse dealer reaction and because National had not met Raytheon's sales expectations. Finally, the dealer originally approached by National testified that Anderson told him that the arrangement with National had resulted in many dealer complaints.

## II

Viewing the evidence most favorably for National, the district court found that it was sufficient to establish that dealers complained to Raytheon. Moreover, some complaints rose to the level of threats that the dealers would cease doing business with Raytheon if the relationship with National was not terminated. The court also found that Raytheon's decision was made in the context of these complaints and that the complaints played a part in the decision. However, the court concluded that Raytheon's decision was the result of unilateral action and that there was not sufficient evidence to raise an inference of a contract or conspiracy among Raytheon and its dealers.

In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court held that a conspiracy cannot be established merely by proof that a manufacturer terminated a distributor in response to dealer complaints. "[S]omething more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." The proof must establish that "the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" 104 S.Ct. at 1471. *See also Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604 (4th Cir.1985).

The difficulty with National's case lies in its lack of evidence that reasonably tends to prove that Raytheon and the complaining dealers schemed to terminate National for the purpose of restraining price compe-

tition. Indeed, the evidence is to the contrary.

Raytheon did not dictate to National the prices at which National sold. The phrase "call for quote," which Raytheon requested National to insert in its mail order catalog instead of prices, allowed National to quote any price it chose when a customer called. Raytheon asked National to furnish future catalogs so it could determine that any prices listed by National were not "drastically down." Raytheon, however, never required National to increase its prices. The only agreement about terms was between National and Raytheon. Indeed, Raytheon's dealers did not learn about the agreement until after Raytheon sold directly to National.

▮ Raytheon did not require its dealers to sell at any fixed price. The dealers set their own retail prices, each taking into consideration its own cost of goods, overhead expenses, and a profit margin that was as much as the market would bear considering demand and competition. Raytheon's dealers competed with each other and with dealers who sold competing brands of similar products. This evidence refutes the charge that Raytheon conspired with one or more dealers to terminate National for the purpose of restraining price competition.

National attempts to avoid the rationale of *Monsanto* by drawing a distinction between vertical and horizontal price restraints. National insists *Monsanto* is inapplicable because it dealt with vertical restraints. It argues that its proof was reasonably sufficient for the jury to find horizontal restraint of price competition.

▮ We find no merit in this argument. The issues in these cases are similar, and the same principles govern. Both cases involve the termination of a dealer by a manufacturer after receiving price complaints from other dealers. In *Monsanto*, the allegation of wrongdoing was conspiracy to set resale prices. Here National alleges a conspiracy to restrain retail price competition. But in order to conspire to

restrain retail price competition there must be some agreement to set, control, fix, maintain, or stabilize prices. Here there was no agreement. Each dealer, including National, set its own prices. Under these circumstances, whether one chooses to allege that the restraint is vertical or horizontal, the lack of a conspiracy to restrain prices leads to the same result. *Monsanto* bars National's claim. The Court explained:

> Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct.... To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market.

104 S.Ct. at 1470.

### III

Raytheon counterclaimed against National for the price of goods shipped under the first release of a purchase order before their relationship was terminated. Raytheon also filed a complaint against Wellington Leisure Products, Inc., which owned an interest in National, alleging that Wellington had guaranteed payment of $125,000 of National's purchases. On these issues Raytheon prevailed. We find no error in the district court's interpretation of the agreement between National and Raytheon or in its instructions to the jury regarding the guaranty.

AFFIRMED.