The GARMENT DISTRICT, INC., Appellant,

v.

BELK STORES SERVICES, INC.; Mathews-Belk Company; Jantzen, Inc., Appellees.

No. 85–2362.

United States Court of Appeals, Fourth Circuit.

Argued April 10, 1986.

Decided Aug. 26, 1986.

Herbert S. Kassner (Stacy J. Haigney, Kassner & Haigney, New York City, C. Michael Wilson, Gerdes, Mason, Brunson, Wilson & Tolbert, Charlotte, N.C., on brief), for appellant.

A. Ward McKeithen (Everett J. Bowman, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., on brief), for appellee Jantzen, Inc.

Benne C. Hutson (E. Osborne Ayscue, Jr., Charlotte, N.C., Smith, Helms, Mulliss & Moore, Raleigh, N.C., on brief), for appellees Belk Stores Services, Inc., and Matthews-Belk Co.

Before RUSSELL and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The Garment District, Inc., appeals a judgment of the district court in favor of Belk Stores Services, Inc., Mathews-Belk Co. (collectively Belk), and Jantzen, Inc., entered on a motion for a directed verdict. 617 F.Supp. 944. The Garment District claims that Belk coerced Jantzen into agreeing to terminate sales to the Garment District in furtherance of a price maintenance scheme in violation of section 1 of the Sherman Act. 15 U.S.C. § 1 (1982). We affirm because the Garment District's evidence is insufficient to permit the inference that Belk and Jantzen acted in concert to set or maintain retail prices. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760–64, 104 S.Ct. 1464, 1469–71, 79 L.Ed.2d 775 (1984).

The district court's entry of judgment on a directed verdict at the close of the Garment District's case requires us to view the evidence most favorably to the Garment District and to give it the benefit of all reasonable inferences that can be drawn from the evidence. We cannot weigh the evidence or pass on the credibility of witnesses, for these are functions reserved for the jury. The evidence must disclose that the Garment District cannot prevail as a matter of law. *See* Fed.R.Civ.P. 50(a); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 (1971).

I

The Garment District was located in Gastonia, North Carolina, and sold clothes at discount prices. One of its competitors in Gastonia was Mathews-Belk, a member of the Belk department store chain. Belk Stores Services provides purchasing assistance to the Belk chain. There are over 400 Belk stores throughout southeastern United States. Approximately 200 of these stores sell Jantzen clothing.

The Garment District opened in the fall of 1981 and carried a full line of Jantzen clothing. Jay Crippen, who worked as Jantzen's sales representative in the Gastonia area, owned an interest in the store in violation of Jantzen's policy against self-dealing by its employees. Jantzen and Belk did not learn of Crippen's proprietary

interest until after Jantzen terminated its relationship with the Garment District.

Mathews-Belk and Ivey's, another Gastonia retailer, also carried a full line of Jantzen clothing. They followed the retail industry's practice of selling clothing at a 100% markup, commonly known as the keystone price. Jantzen's suggested retail price was the keystone price. The Garment District sold Jantzen clothing at a 30–35% markup. It was the only consistent discounter of Jantzen clothing in Gastonia.

Soon after the Garment District opened, Belk pressured Jantzen to stop supplying the store by threatening Jantzen with the loss of all of Belk's business. Jantzen was not permitted to attend Belk's annual trade show. In addition, Mathews-Belk placed its Jantzen clothing in the budget basement and sold it at discount prices. In January 1982, Belk officers met with Crippen and John Jenkins, the regional manager for Jantzen, to discuss the situation in Gastonia. The Belk officers complained of sales to the Garment District, referring to it as the discount store. After the meetings, Crippen and Jenkins visited the Garment District at which time Jenkins decided to terminate Jantzen's relationship.

Jenkins instructed Crippen to terminate the Garment District on the pretext that the store did not present a suitable image for a Jantzen retailer. In fact, the relationship was terminated because of the pressure exerted by Belk. Jenkins notified Belk of Jantzen's decision to terminate the Garment District in a letter dated January 18, 1982.[1] A Belk officer later requested that all copies of the letter be destroyed out of concern for its legal implications. Crippen, however, did not destroy his copy.

Belk also coerced Jantzen into terminating its sales to the Burlington Coat Factory Warehouse, a discount store located in Charlotte, North Carolina, by again threatening Jantzen with the loss of all of Belk's business. Belk successfully pressured Puritan Sportswear into halting its sales to the Garment District. Jantzen did not participate in this incident. Jantzen continued to deal with the World of Clothing, a discount store in Hendersonville, North Carolina, which sold a large volume of Jantzen's products.

The district court granted the defendants' motions for a directed verdict at the close of the Garment District's evidence. The court ruled:

> The Plaintiff produced no evidence that there was any agreement or "conspiracy" between Jantzen and Belk to maintain resale prices. A conspiracy to maintain resale prices simply was not established by proof that the Defendant manufacturer terminated the Plaintiff following or even in response to, complaints or threats by the Defendant Belk.[2]

1. Mr. Bob Smith
   G.M.M. Men's & Boy's Wear
   Belk Stores Services, Inc.
   308 East Fifth Street
   Charlotte, North Carolina 28231
   Dear Bob:
   I wanted to inform you on what has taken place regarding our problems in your Gastonia trade area.
   On January 11, 1982 I had an appointment with Mr. Matthews of the Gastonia store. We had a very open discussion in which we were both able to air our positions as to the problems we both face in his market area.
   I was made aware by Mr. Matthews of the past and present problems and assured him of Jantzen's desire to solve these problems at once.
   Bob, I must say that I was surprised by the situation that exists in Gastonia. I will also say that this situation should not exist and

that we, at Jantzen, will make every effort to see that it is rectified.
Jantzen's area of distribution has not changed and Jantzen has no plan to change it in the future. Jantzen is very appreciative of its business with Belk's and we will continue to offer Belk's the finest goods and service that is available to our industry.
In closing let me say again that the situation that exists in Gastonia is a mistake on our part and that we intend to rectify this situation.
Thank you for bringing this problem to my attention.
Kindest regards,
John Jenkins

2. We find it unnecessary to address the district court's other ground, failure to prove damages, for directing a verdict against the Garment District.

## II

■ Concerted action by a manufacturer and its retailers to set or maintain the manufacturer's retail prices violates section 1 of the Sherman Act. *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Nevertheless, the manufacturer, acting independently, may announce a price and terminate those retailers who fail to adhere to it. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). A manufacturer's termination of a discounting distributor, in response to complaints from other distributors, is insufficient by itself to prove an illegal price-fixing conspiracy. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760–64, 104 S.Ct. 1464, 1469–71, 79 L.Ed.2d 775 (1984); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, — U.S. —, 106 S.Ct. 1348, 1363 n. 1, 89 L.Ed.2d 538 (1986) (White, J., dissenting).

In *Monsanto*, the Court explained that "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." 465 U.S. at 763, 104 S.Ct. at 1470. Therefore, barring "a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market." 465 U.S. at 764, 104 S.Ct. at 1470. Accordingly, the Court held that to create an inference of conspiracy, "something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U.S. at 764, 104 S.Ct. at 1471. "[T]here must be direct or circumstantial evidence ... that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." 465 U.S. at 768, 104 S.Ct. at 1473. Conduct that is as "consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 106 S.Ct. at 1357.

This court applied *Monsanto* in *National Marine Electronic Distributors, Inc. v. Raytheon Co.*, 778 F.2d 190 (4th Cir.1985). Raytheon terminated its relationship with National after receiving complaints from other dealers who were being undersold. Some of these complaints "rose to the level of threats that the dealers would cease doing business with Raytheon if the relationship with National was not terminated." *Raytheon*, 778 F.2d at 192. These threats influenced Raytheon's decision to terminate National. *See* 778 F.2d at 192.

We affirmed a directed verdict for Raytheon because of the "lack of evidence that reasonably tends to prove that Raytheon and the complaining dealers schemed to terminate National for the purpose of restraining price competition." 778 F.2d at 192–93. We noted that Raytheon did not dictate to its dealers the prices at which they sold. Instead, "[t]he dealers set their own retail prices.... Raytheon's dealers competed with each other and with dealers who sold competing brands of similar products. This evidence refutes the charge that Raytheon conspired with one or more dealers to terminate National for the purpose of restraining price competition." 778 F.2d at 193. We held that National's claim was barred because there was no evidence of an agreement to maintain prices.

## III

Jantzen did not set retail prices. Crippen, testifying on behalf of the Garment District, said that although Jantzen suggested retail prices, each merchant was free to set its own price. Ivey's, Mathews-Belk, and the World of Clothing sold at different prices without interference from Jantzen.

Belk and Jantzen pursued different goals. Belk brought pressure against Jantzen in order to eliminate a discount competitor. Jantzen, weighing the advantages of selling to 200 Belk stores against selling to the Garment District, opted to drop the Garment District. Although Jant-

zen responded favorably to Belk's complaints about the Garment District, it did not enter into any agreement with Belk to fix or maintain retail prices. Belk and its neighboring competitor, Ivey's, remained free to set their own prices. Consequently, the Garment District's claim fails unless *Monsanto* and *Raytheon* can be distinguished.

## IV

The Garment District's principal argument for distinguishing *Monsanto* and *Raytheon* is that in those cases the dealers merely complained about competing discounters whereas the conduct of Belk rose to the level of "economic duress, coercion and threats." The Garment District seeks to draw a distinction between the complaints of small, independent dealers and the coordinated pressure that was exerted by Belk who threatened Jantzen with the loss of business of approximately 200 Belk stores.

We reject this argument. In *Raytheon,* the dealers not only complained that they were being undersold, they also threatened to terminate their business with Raytheon. Moreover, an effort was made by some of the dealers to coordinate their threats to exert additional pressure on Raytheon.

■ The only distinction between this case and *Raytheon* is that Belk was able to exert greater pressure because it represented 200 stores. This distinction does not alter our analysis. *Monsanto* holds that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints. One reason is to avoid losing the business of disgruntled dealers. This reason grows in importance as the volume of dealer complaints increases. A manufacturer is not prohibited from avoiding the potential loss of many of its dealers because it acted in response to price complaints. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. Therefore, regardless of whether the complaints are mere expressions of dismay or constitute economic duress, coercion, and threats, the terminated distributor must still present additional evidence that the manufacturer and another distributor acted in concert to set or maintain prices. *See Monsanto,* 465 U.S. at 764[3], 104 S.Ct. at 1471.

The Garment District also argues that *Monsanto* and *Raytheon* are distinguishable because they involved a different market structure. In both of those cases, the manufacturer's marketing strategy imposed nonprice restrictions on its distributors. The Garment District relies on the following discussion of these restrictions in *Monsanto:* "The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen. or demonstrating the technical features of the product, and will want to see that 'free-riders' do not interfere." 465 U.S. at 762–73, 104 S.Ct at 1470. In these circumstances, "[a] manufacturer and its distributors have legitimate reasons to exchange information about … prices" and to terminate discounters who are able to undersell distributors who must bear the costly nonprice restrictions. 465 U.S. at 762, 104 S.Ct. at 1470. The Garment District proved that similar nonprice restrictions do not exist in the retail clothing industry. Therefore, the Garment District contends

---

**3.** The Garment District relies on *Marco Holding Co. v. Lear Siegler, Inc.,* 606 F.Supp. 204, 1985–1 Trade Cas. ¶ 66,446 (N.D.Ill.1985), and *The Jeanery, Inc. v. James Jeans, Inc.,* 1984–2 Trade Cas. ¶ 66,278 (D.Ore.1984), for the proposition that termination in response to dealer threats is sufficient to create an inference of conspiracy. However, the threats in those cases are comparable to the threats made in *Raytheon.* To the extent that these cases conflict, we adhere to our decision in *Raytheon.* For the same reason, we decline to follow *Cernuto, Inc. v. United Cabinet*

*Corp.,* 595 F.2d 164 (3d Cir.1979), a pre-*Monsanto* decision. The Garment District's reliance on *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604 (4th Cir.1985), is also misplaced. In *Terry's,* this court affirmed summary judgment for the defendants where there were "at most two complaints by a single distributor." 763 F.2d at 615. *Terry's* simply does not address, either directly or by implication, the present situation where a dealer has applied economic duress, coercion, and threats.

that Belk had no legitimate reason to complain about its discount operations.

The market structure in *Monsanto* and *Raytheon*, and the problem of free-riders, explain why distributors were being undersold and hence why they complained. However, the critical element in the *Monsanto* analysis is not what motivates the distributors to complain, but rather what motivates the manufacturer to terminate discounters in response to these complaints. Here, as in *Raytheon*, the manufacturer sought to retain many dealers by sacrificing one. It acted without exacting an agreement from the remaining dealers to maintain prices.

The Garment District also seeks to distinguish *Monsanto* and *Raytheon* on the ground that most clothing stores sell their clothes at keystone prices. Because many retailers adhere to a uniform price, the Garment District asserts that it "did not need to prove that *Jantzen* attempted to fix a particular price. The theory of the plaintiff's case was that the *Belk defendants* procured the termination of The Garment District for the purpose of avoiding price competition." The Garment District asserts that Belk's coercion resulted in reverse price fixing in which the retailer's buying power was used to engage the manufacturer in concerted action to preserve the retailer's keystone price. It argues that although the initiative for maintaining the price flowed from the retailer to the manufacturer, which is the reverse of the ordinary situation, the termination of the Garment District was nonetheless a *per se* violation of the Sherman Act.

Section 1 of the Sherman Act does not proscribe independent action. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. Therefore, it is insufficient merely to show that Belk sought to restrain competition, or that Jantzen's decision to terminate the Garment District harmed competition. Instead, the Garment District must present evidence "that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." 465 U.S. at 768, 104 S.Ct. at 1473. *Monsanto* emphasizes that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints, notwithstanding the harm to competition that results. Therefore, the fact that other retailers independently adhere to keystone pricing does not relieve the Garment District of its obligation of showing that Jantzen acted in concert to set or maintain retail prices.

The Garment District contends that even if *Monsanto* and *Raytheon* govern this case, it presented sufficient evidence for the jury to find concerted action. It emphasizes that Jantzen's assertion that the Garment District was terminated because of its poor image was a pretext. The Garment District contends that evidence that a manufacturer's stated reasons for terminating a distributor are pretextual is sufficient to create an inference of conspiracy.

The Garment District relies on *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir.1985). In *Fragale*, wholesalers refused to supply a new beer distributor, allegedly because of his inexperience and because there was insufficient demand to justify an additional distributor. The court noted that the distributor "challenged each reason offered by [the defendants] for refusing to deal.... This evidence of pretext, if believed by a jury, would disprove the likelihood of independent action on the part of [the defendants]." 760 F.2d at 474. Accordingly, the court held that the distributor had satisfied *Monsanto*'s requirement that there be additional evidence of a conspiracy.

We believe that *Fragale* is distinguishable. There was no allegation in *Fragale* that competing distributors threatened to stop buying from the defendants if they supplied the new distributor. Therefore, the defendants were not placed in the position of having to choose which distributor's business to relinquish. By contrast, Jantzen was forced to choose between the Garment District and Belk. It chose Belk, which was a larger customer. Therefore, even if Jantzen's concern about the Gar-

ment District's image was pretextual, it still had a legitimate, independent reason to terminate their relationship. The Court has stated that conduct that is as "consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 106 S.Ct. at 1357.

The Garment District also contends that the following evidence meets the *Monsanto* standard: Belk Stores Services excluded Jantzen from its trade show and Mathews-Belk placed Jantzen's goods in its budget basement in reprisal for Jantzen's decision to sell to the Garment District; Jantzen notified Belk in writing of its decision to terminate the Garment District; and a Belk officer attempted to destroy all copies of Jantzen's letter because of its detrimental effect on future litigation.

■ We do not agree that this evidence is sufficient. The decisions to exclude Jantzen from Belk's trade show and to place Jantzen's goods in the budget basement are comparable to Belk's threats to stop doing business with Jantzen. They were measures to exert pressure on Jantzen. Jantzen's letter simply acknowledges its decision to terminate the Garment District. In *Raytheon,* we noted that "[a]nother dealer testified that [a Raytheon official] admitted to him that Raytheon had terminated National because of the adverse dealer reaction...." 778 F.2d at 192. The fact that Jantzen communicated its decision in writing instead of orally is of no consequence. The attempt to destroy the letter reflects Belk's concern about the lawfulness of its conduct, but this act, which cannot be condoned, is insufficient to permit an inference of concerted action to maintain prices.

### V

■ The Garment District failed to present evidence of an agreement between Jantzen and Belk to set, control, fix, stabilize, or maintain prices. *Monsanto* establishes that Belk's complaints about the Garment District's discount prices and Jantzen's termination of the Garment District in response to these complaints are insufficient to permit the inference that Belk and Jantzen entered into such an agreement. *Raytheon* establishes that complaints that rise to the level of threats do not alter the standard of proof prescribed by *Monsanto.* Therefore, Jantzen, acting independently, could announce its suggested retail price and terminate the Garment District, which sold at a discount, without violating section 1 of the Sherman Act. *Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469; *Colgate,* 250 U.S. at 307, 39 S.Ct. at 468.

AFFIRMED.