**PARKWAY GALLERY FURNITURE, INC.; Rose Furniture Company, Plaintiffs–Appellants,**

v.

**KITTINGER/PENNSYLVANIA HOUSE GROUP, INC., d/b/a Pennsylvania House, Defendant–Appellee.**

No. 88–1100.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1988.

Decided July 5, 1989.

Norman Barrett Smith (Martha A. Geer, Smith, Patterson, Follin, Curtis, James & Harkavy, Raleigh, N.C., on brief), James Robert Fox (William Kearns Davis, Richard V. Bennett, Bell, Davis & Pitt, P.A., Winston Salem, N.C., on brief), for plaintiffs-appellants.

Margaret Moran Zwisler (Ralph J. Savarese, Thomas J. Horton, Howrey & Simon, Washington, D.C., James R. Hubbard, David C. Smith, Allman, Spry, Humphreys, Leggett & Howington, P.C., Winston Salem, N.C., Edward J. Harrison, Executive Vice President and Gen. Counsel, Chicago Pacific Corp., on brief), for defendant-appellee.

Before HALL, PHILLIPS, and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Appellants Parkway Gallery Furniture, Inc., and Rose Furniture Company are retail furniture dealers in North Carolina. Appellee Kittinger/Pennsylvania House

Group, Inc., manufactures furniture and supplies it to appellants and other furniture dealers for retail sales. In response to complaints by various dealers of sales lost to stores, such as Parkway and Rose, that sell at discounts and fill mail or telephone orders from outside their local trading areas, Pennsylvania House prohibited its dealers from soliciting or selling its furniture by mail or by telephone to consumers residing outside specified areas of retail responsibility.

Rose and Parkway brought these actions in the district court charging that Pennsylvania House violated section 1 of the Sherman Act, 15 U.S.C. § 1, sections 2(a) and 3 of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. §§ 13(a), 14, and sections 75–1 *et seq.*, and 75–1.1 of the North Carolina General Statutes. They demanded money damages and injunctive relief. Pennsylvania House moved for partial summary judgment on the Sherman Act claims only, and the district court granted its motion and entered judgment for them on those claims. Rose and Parkway appeal. We affirm.

Pennsylvania House, a division of General Mills, Inc., is headquartered in Lewisburg, Pennsylvania. It manufactures American traditional furniture which is sold to consumers through 450 independent retail dealers. It has annual sales of approximately $85,000,000 and employs about 1,200 people. Having no company-owned dealers, Pennsylvania House relies wholly upon independent dealers for retail sales. Since 1975, Pennsylvania House has placed two specific contractual duties on its dealers. First, they must dedicate floor space to display its furniture and are urged to arrange the furniture in a room-like setting in order to establish a Pennsylvania House "gallery." Second, dealers must participate in Pennsylvania House's promotional programs and invest in local tabloids to advertise Pennsylvania House lines.

Rose and Parkway are full-service retail furniture stores in High Point and Boone, North Carolina, respectively. In 1986, Rose purchased more furniture from Pennsylvania House than did any other dealer. Rose, a "deep discounter," sells at discounts of from 30% to 40% or more off manufacturer's suggested retail prices and operates over a large portion of the country with retail sales of about $27 million per year. Rose averages walk-in traffic of 400 to 500 customers per weekday and 550 to 600 customers on Saturday at its showroom and averages 1100 to 1300 telephone inquiries per day. Parkway, also a discounter, receives about 100 customers a day and devotes much of its floor space to Pennsylvania House. Both Rose and Parkway fully comply with Pennsylvania House's requirements concerning dedicated floor space and promotional programs.

Over the past several years, other dealers throughout the country have complained to Pennsylvania House that they were losing sales to discount dealers. Specifically, a marketing survey conducted by Pennsylvania House indicated that dealers were upset that consumers visited their stores for shopping, display, and sales assistance but then ordered furniture from Parkway and Rose at discount. Many dealers resisted promoting Pennsylvania House furniture only to see the sales go to discounters. Pennsylvania House responded by revising its Retail Marketing Policy to prohibit dealers from soliciting or selling its furniture by mail or telephone order to consumers residing outside specified sales areas.[1] Before promulgating the new poli-

---

1. The Retail Marketing Policy, revised as of June 1, 1986, provided:

   a. *Area of Retail Responsibility.* The Retailer shall conduct its solicitation and sale of Pennsylvania House furniture within a designated geographic area, as defined from time to time by Pennsylvania House in its sole discretion. . . .

   . . . .

   2. *Solicitation or Sale to Consumers Outside the Area of Retail Responsibility by Mail Order, Telephone Order or Advertising.* The Retailer acknowledges that the sale of Pennsylvania House furniture only through authorized retail dealers who effectively advertise, promote, display and service Pennsylvania House furniture in their respective areas of retail responsibility benefits the consumer and the Pennsylvania House distribution system by enhancing the ability of authorized Pennsylvania House retail dealers to compete in the fiercely competitive market for furni-

cy, Pennsylvania House discussed with its dealers other manufacturers' similar policies. Former Pennsylvania House regional sales manager Walter Litchfield testified that the new policy constituted a very clear, concise pledge to its dealer network regarding the North Carolina discounters. Ed Roberts, Pennsylvania House President, and once its Marketing Vice–President, testified that Pennsylvania House and a great number of its dealers were in agreement with the aims and purposes of the policy.

Pennsylvania House surveyed the reaction to its new retail marketing policy and obtained favorable feedback from very many of its dealers. With respect to North Carolina dealers, Pennsylvania House National Sales Manager Terry Martina reported that one dealer "totally agrees" with the policy and "will *abide totally*."[2] Ed Roberts testified that some North Carolina dealers had indicated that they were willing to "come around" and abide by the ban. Other dealers informed Parkway customers of Pennsylvania House's new policy, and one dealer notified Pennsylvania House of a violation and sought enforcement.

Parkway and Rose contend that these actions of Pennsylvania House and its dealers constituted a conspiracy to fix prices and are therefore a "per se" violation of the Sherman Act. Alternatively, they contend that Pennsylvania House and some dealers engaged in a conspiracy in restraint of trade. Pennsylvania House contends that it and the dealers acted independently to correct faults in marketing and to protect their businesses, respectively, so that their actions did not constitute either a per se violation of the Sherman Act or a violation under the "rule-of-reason" analysis. The district court found that Parkway and

Rose had not produced sufficient evidence of a conspiracy between Pennsylvania House and its dealers and therefore did not consider whether a per se or rule-of-reason analysis applied to their claims. We thus review only the conspiracy aspects of their claims.[3]

Pennsylvania House contends that all claims of alleged conspiracy under the Sherman Act are governed by *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Parkway and Rose, while conceding that *Monsanto* controls the price-fixing count of their complaint, contend that it does not apply to their claim of conspiracy to inhibit competition through nonprice restrictions.

In *Monsanto*, the Supreme Court reviewed a lower court holding to the effect that an antitrust plaintiff can survive a motion for a directed verdict if it shows that a manufacturer terminated a price-cutting distributor in response to complaints by other distributors. *Id.* at 759, 104 S.Ct. at 1468. Spray–Rite, a discount wholesale distributor of agricultural chemicals that bought in large quantities and sold at a low margin, was an authorized distributor of Monsanto herbicides. Monsanto did not renew Spray–Rite's distributorship, allegedly as part of a vertical price-fixing conspiracy, after numerous complaints from competing distributors about Spray–Rite's price-cutting practices. *Id.* at 755–57, 759, 104 S.Ct. at 1466–67, 1468.

The Supreme Court began its analysis by reviewing the rules established in *Continental T.V., Inc. v. GTE Sylvania Inc.* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), in which it had held that independent actions by retailers and manufacturers that together have an anticompetitive effect are not illegal under section 1 of the

---

ture. Accordingly, the Retailer shall not engage in the solicitation or sale of authorized products to consumers outside the Retailer's area of retail responsibility through mail order, telephone order or advertising.

2. Emphasis in original.

3. The per se/rule-of-reason dividing line, *see Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), is pertinent only to the extent that

the applicable conspiracy standards may differ. Although both parties advance arguments concerning the sufficiency of the evidence that this is a price-fixing case (per se) or, if not, that trade was unreasonably restrained (rule of reason), such questions are not directly in issue. In view of our disposition of the question of the conspiracy standards, we need not address these arguments.

Sherman Act and that, while concerted action to set price terms is per se illegal, concerted vertical action to establish non-price restrictions must be proven under the rule of reason. The Court then stated:

> On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the [*Sylvania*] doctrine[ ] ... will be seriously eroded.

*Id.* 465 U.S. at 763, 104 S.Ct. at 1470. The Court then noted that action taken by a manufacturer following distributors' complaints was often legitimate business conduct and stated:

> In sum, "to permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute."

*Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 111 n. 2 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

In view of these concerns, the Court held that, in order for an antitrust plaintiff alleging a price conspiracy to survive a directed verdict, he must prove

> something more than evidence of complaints.... There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.... "[A] common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both

that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

*Id.* (citations and quotation marks omitted; footnote incorporated into text). The Court concluded that (a) evidence that, on at least two occasions, Monsanto approached other price cutters, advised them that they would not receive adequate supplies if they persisted in selling below the suggested retail price, and received the distributors' acquiescence, *id.* 465 U.S. at 765, 104 S.Ct. at 1471, and (b) evidence that Monsanto published a newsletter that could reasonably be interpreted as referring to an agreement or understanding that distributors would maintain prices and that Monsanto would terminate those who did not, *id.* at 765–66, 104 S.Ct. at 1471–72, was sufficient to support a finding of conspiracy.

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court elaborated on *Monsanto:*

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in [*Monsanto* ], we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.

*Id.* at 588, 106 S.Ct. at 1357 (citations and quotation marks omitted). The Court explained that "ambiguous conduct ... does not, without more, support even an inference of conspiracy." *Id.* at 597 n. 21, 106 S.Ct. at 1362 n. 21.

This Court has similarly been sensitive to *Monsanto's* requirement that there be clear evidence of concerted activity. In *Garment District, Inc. v. Belk Stores Services,* 799 F.2d 905 (4th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988), a vertical price-fixing case, we noted:

[T]he critical element in the *Monsanto* analysis is not what motivates the distributors to complain, but rather what motivates the manufacturer to terminate discounters in response to these complaints. Here, ... the manufacturer sought to retain many dealers by sacrificing one. It acted without exacting an agreement from the remaining dealers to maintain prices.

....

... *Monsanto* emphasizes that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints, notwithstanding the harm to competition that results. Therefore, the fact that other [dealers] independently adhere to [full] pricing does not relieve the [plaintiff discounter] of its obligation of showing that [the manufacturer] acted in concert to set or maintain retail prices.

*Id.* at 910.

Initially, Parkway and Rose argue that the *Monsanto* analysis does not apply to nonprice restriction claims because the Supreme Court intended the *Monsanto* conditions to serve as a breakwater against the harsh effects of the per se rule in price-fixing cases, where a finding of conspiracy will trigger triple damages. Such a concern is absent, they argue, in nonprice restriction cases where the plaintiff must also prove an anticompetitive effect under the rule of reason.

■ We do not discern such a limiting intent in the *Monsanto* opinion. Although the Court expressed a concern that treble-damage liability might be imposed automatically in inappropriate cases, its analysis of a standard for determining a conspiracy, *vel non,* rested primarily on its concern that allowing an agreement to be inferred solely from a manufacturer's action in response to dealers' complaints might penalize legitimate conduct. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, ——, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808, 818 (1988). In our view, this concern applies to both price restriction and nonprice restriction claims, regardless of whether the claim is evaluated under the

per se or the rule-of-reason standard. Indeed, we have already applied *Monsanto* to nonprice claims. *See White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 102–03 (4th Cir.1987); *Terry's Floor Fashions v. Burlington Industries,* 763 F.2d 604, 610–12, 612 n. 14 (4th Cir.1985). We do so here as well. In our view, the rules laid down in *Monsanto* and *Matsushita* are not restricted to price-fixing cases, and we thus conclude that "something more" than a bare complaint and a response to it is necessary to support an inference of a conspiracy in a nonprice restriction claim.

■ Without question, the Retail Marketing Policy instituted by Pennsylvania House resulted from complaints by retailers that they were being hurt by the deep discounting practices of Parkway and Rose. The teaching of *Monsanto,* however, is that such circumstances alone are insufficient to show a conspiracy. Parkway and Rose argue, however, that, even if *Monsanto* applies, its requirements have been satisfied here. They contend that their testimonial and documentary evidence provided the "something more" required by *Monsanto.* They argue that the "something more" consists of Litchfield's characterization of the policy as a "pledge" to the dealers, of Roberts' testimony that a great number of dealers were in agreement with the aims and purposes of the policy, of the involvement of dealers in the pre-promulgation stages of formulation of the policy, and of a dealer's notification to Pennsylvania House of a violation of the policy and its request for enforcement. Parkway and Rose also stress that the sought-for communication of acquiescence or agreement is evidenced by Roberts' testimony that some dealers had indicated that they were willing to "come around" and abide by the ban, from which they infer that Pennsylvania House solicited the dealers' assurances, and by Martina's report of his canvassing of dealers that stated that one dealer "totally agrees" with the policy and "will abide totally."

Pennsylvania House, on the other hand, argues that Parkway and Rose have not met their burden to "present evidence that tends to exclude the possibility that the alleged conspirators acted independently,"

*Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1357. We agree. Any evidentiary fact may support a wide range of inferences, but the discrete inferences necessary under *Monsanto* to support a conspiracy theory simply do not flow either from Roberts' testimony or from Martina's report that Pennsylvania House sought assurances from its dealers that they would comply with its new marketing policy.[4] We conclude, therefore, that the evidence does not present a genuine issue of material fact as to whether the alleged conspirators acted independently. In our view, the evidence simply does not add the "something more" required by *Monsanto* by rising to the level of "a conscious commitment to a common scheme" or of "a unity of purpose or a common design and understanding, or a meeting of minds," 465 U.S. at 764, 104 S.Ct. at 1471.[5]

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

**4.** We are aware that the Eighth Circuit has held that evidence that, following termination of a discounter after a dealer complained, a manufacturer reported to the dealer that "the problem had been taken care of," coupled with the discounter's testimony that "the only reason [a manufacturer's employee] could figure out that they were terminating me is to give [the dealer] some relief," sufficiently tended to exclude the possibility that the manufacturer and dealer were acting independently. *McCabe's Furniture v. La-Z-Boy Chair Co.,* 798 F.2d 323, 328 (8th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988). Similarly, the Eleventh Circuit has stated that evidence that, following a complaint about a discounter, a manufacturer notified the complaining dealer that "corrective action has been taken" and requested that the dealer notify it of any further problems, when coupled with the dealers' "thank you" that created an inference that the dealer agreed to notify the manufacturer, met *Monsanto's* requirements "precisely." *Helicopter Support Systems v. Hughes Helicopter, Inc.,* 818 F.2d 1530, 1535–36 & n. 6 (11th Cir.1987).

In our view, however, those decisions have in effect misconstrued "tends to exclude the possibility" of independent conduct, *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1357, to mean something like "arguably consistent with the possibility of a conspiracy."

---

**5.** Parkway and Rose also allege that Pennsylvania House violated the Sherman Act by inducing their participation as unwilling co-conspirators and by engaging in a horizontal conspiracy with other manufacturers. To prevail on the former theory, Parkway and Rose must show "acquiescence in ... firmly enforced restraints ... induced by the communicated danger of termination." *Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968) (quotation marks omitted), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 765–66, 777, 104 S.Ct. 2731, 2738–39, 2745, 81 L.Ed.2d 628 (1984). Parkway and Rose have shown only that they complied with the policy for two weeks until it was suspended as to them per an agreed order. As with the section 1 conspiracy theory, "something more" is required, and here, too, Parkway and Rose failed to provide it. With respect to the horizontal conspiracy argument, Parkway and Rose have shown only that Pennsylvania House was aware that other manufacturers had similar policies and was aware of their terms. Parkway and Rose, however, have failed to demonstrate a conspiracy among the manufacturers to implement the policies.